**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RALPH MOORE, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 25-CV-4682 |
| | : | |
| WARDEN ERICKA PATTERSON, *et al.*, | : | |
|     Defendants. | : | |

**MEMORANDUM**

**HENRY, J.**                                                      **MARCH 11, 2026**

Plaintiff Ralph Moore, a pretrial detainee currently housed at the Riverside Correctional

Facility ("RCF") filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983, asserting violations of

his constitutional rights arising from events that occurred while he was housed at the

Philadelphia Industrial Correctional Center ("PICC") and the Philadelphia Detention Center

("PDC"), and the conditions of confinement he experienced at those facilities.  Currently before

the Court are Moore's Complaint ("Compl." (ECF No. 1)), his third Motion for Leave to Proceed

*In Forma Pauperis* (ECF No. 10), and his Prisoner Trust Fund Account Statement (ECF No. 11).

In his Complaint, Moore asserts claims against PICC Warden Ericka Patterson, Corizon Health

("Corizon") Medical Director Bruce Heard, Correctional Officer ("CO") Denmark, the

Philadelphia Department of Prisons, "Medical Staffing Department Detention Center," ("PDP"),

and PDC Warden Rose.  (Compl. at 13-14.)  Each of these Defendants is sued in their individual

and official capacities.  (*Id*. at 14.)  After filing his Complaint, Moore filed a second Motion to

Proceed *In Forma Pauperis* that includes material that the Court understands is intended to

supplement the Complaint, in that it includes additional claims asserting violations of Moore's

constitutional rights against CO Miro that occurred after the filing of the original Complaint.

(ECF No. 7 at 11-12.)  For the following reasons, the Court will grant Moore leave to proceed *in forma pauperis* and will permit him to supplement his Complaint.  The following claims will be dismissed with prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii): Moore's claims against the PDP, his claims based on handling of grievances, his Fourth Amendment claims based on the search of his cell, his Fourteenth Amendment claims based on confiscation of his personal property, his Fifth Amendment claim, and his official capacity claim against Heard.  The following claims will be dismissed without prejudice for failure to state a claim: Moore's claims against Corizon, his First Amendment retaliation and religious freedom claims, his Fourteenth Amendment conditions of confinement and deliberate indifference claims, his claims asserting supervisory liability, and his official capacity claims against Patterson, Rose, Denmark, and Miro.  Moore will be granted leave to amend these claims.  The Court is prepared to serve Moore's excessive force claims against Denmark and Miro, but Moore will first be given the option of amending his Complaint to address the deficiencies identified in this Memorandum, or of preceding at this time on his claims against Denmark and Miro.

I.   **FACTUAL ALLEGATIONS**[1]

A.   **Moore's Complaint**

Moore alleges that the events giving rise to his claims occurred between January 2024 and August 2025 while he was confined at PICC and PDC.  On January 1, 2024, Moore suffered a seizure and fell from his top bunk, hitting his head.  (Compl. at 15.)  After COs found him on the floor of his cell, he was taken to Jefferson Hospital for treatment.  (*Id.*)  He suffered another

---

[1] The factual allegations set forth in this Memorandum are taken from Moore's Complaint (ECF No. 1).  The Court adopts the pagination supplied by the CM/ECF docketing system.  Where appropriate, grammar, spelling, and punctuation errors in Moore's pleading will be corrected for clarity.

seizure on February 2, 2024, and alleges that when he awoke, he was "attacked by COs," then taken to the medical unit for treatment. (*Id*.) He was then transferred to "the hole," which he describes as segregation. (*Id*.) While assigned there, he occupied a cell with no running water and "feces everywhere." (*Id*.) He alleges that his belongings were taken when he was transferred to segregation. (*Id*. at 16.)

After one week in segregation, Moore was transferred to PDC, where he occupied a cell allegedly covered in urine and feces, and without running water. (*Id*.) For the week he remained there, he was not provided with toilet tissue, soap, or showers. (*Id*.) His clothes were taken, and he was provided with only a smock to wear. (*Id*.) Moore alleges that during medication distribution, CO Denmark slapped and punched him and told him to take his "F'n" meds when Moore informed Denmark that the medications that were provided were different from those he usually received. (*Id*.)

After a week at PDC, Moore was transferred back to PICC, where he was again placed in segregation, where he remained for an additional week. (*Id*. at 17.) Following a hearing addressing claims that he attempted to escape, Moore was found guilty and again assigned to the segregated unit for 30 days, to be followed by a term of Administrative Custody. (*Id*.) Moore alleges that while housed in the segregated unit, he filed multiple grievance appeals, to which he received no response. (*Id*.) He also alleges that he lost a significant amount of weight while in the segregated unit because he was provided with food to which he was allergic. (*Id*.) Additionally, he claims he was not provided with clean sheets or towels and received only one set of clothing during the 25 days he remained in segregation. (*Id*.)

Moore alleges that on April 6, 2024, a sewage pipe at PICC burst, causing water and sewage to flow into his cell. (*Id*. at 18.) The correctional officer on duty was alerted and, rather

than addressing the situation, laughed and suggested that maintenance be called. (*Id*.) Moore alleges that as a result of the flood, his property, including food, legal work, mail, and clothing, was ruined. (*Id*.) Additionally, the standing water made eating and praying in his cell difficult, but he was not permitted to eat or pray outside of his cell. (*Id*.)

On September 27, 2024, the HVAC at PICC failed. (*Id*. at 19.) Inmate complaints about excessive heat were allegedly ignored. (*Id*.) When supervisors, including non-Defendants Deputy Warden Duncan, Lt. Gill, and Sargent Bellinger responded to inmate complaints, they told the inmates that changes were being made to the HVAC system and that they would be accommodated during the process with additional water and time outdoors. (*Id*. at 20.) However, the single water cooler provided was not sufficient for all the inmates, and additional outdoor time was cancelled after an inmate attempted to escape. (*Id*.) Moore alleges that the temperature in his cell was over 100 degrees, it reeked of mildew, and that it was so hot that COs refused to work on the affected blocks. (*Id*.) He alleges that on October 5, 2024, he became dizzy as a result of dehydration and the extreme heat. (*Id*. at 21.) He attempted to signal to a CO, but none were present. (*Id*.) He unsuccessfully tried to hydrate himself with the little water he had but passed out and hit his head. (*Id*.) When he awoke in the medical unit, he was told that he had had a seizure and that he had bitten his tongue. (*Id*.) He was given Tylenol and cold water and sent back to his cell. (*Id*.) He has continued to experience dizziness and migraines since this incident. (*Id*. at 22.)

On November 11, 2024, Moore experienced a seizure and fell off his bunk, injuring his wrist and arm. (*Id*.) He was taken to the medical unit, where he was given Tylenol, scheduled for an x-ray, and returned to his cell. (*Id*.) Moore alleges that he had an x-ray on November 14,

2024, but received no treatment for his injury, though he was experiencing pain and swelling. (*Id*. at 23.)  He alleges that his wrist turned blue and his hand and fingers appeared pale.  (*Id*.)

On November 22, 2024, prior to a scheduled court appearance, Moore suffered a seizure and was taken to Jefferson Hospital, where he was treated for the seizure and received an additional x-ray of his arm.  (*Id*.)  He was informed that his forearm was broken.  (*Id*. at 24.)  He was provided with a splint and pain medication and the examining physician recommended that surgery be scheduled within the week.  (*Id*.)  The surgery was not performed until March 18, 2025.  (*Id*. at 25.)  Following the surgery, Moore was transferred to the Infirmary at PDC, and eventually, to a cell.  (*Id*.)  He alleges that he was not examined when he was in the Infirmary, did not receive his prescribed medication, and was not provided with a meal the entire day.  (*Id*. at 26.)  He became light-headed and passed out.  (*Id*. at 26-27.)  When he awakened, he was taken to Jefferson Hospital, where he experienced a seizure, for which he received treatment. (*Id*. at 27.)  He was then returned to the Infirmary at PDC where he was provided with a sandwich.  (*Id*.)

On February 7, 2025, Moore alleges that he was awakened by COs yelling to inmates to evacuate their cells.  (*Id*. at 24.)  Moore alleges that the block was filled with smoke.  (*Id*.) Inmates were escorted to the gym, where they remained until mid-afternoon.  (*Id*. at 25.)  Upon returning to his cell, Moore noted that a search had apparently been conducted in his absence. (*Id*.)  Documents and personal items were missing.  (*Id*.)

Moore alleges that prior to the arrest that resulted in his detention at PICC, he had an appointment for surgery to remove a bullet lodged in his chest.  (*Id*. at 27.)  He informed prison officials numerous times of the appointment, using sick call requests and grievances.  (*Id*.)  X-rays showed the bullet changing position, and the results of EKGs performed contemporaneously

were abnormal. (*Id*. at 28.) Moore claims that he was never taken to scheduled cardiology appointments because no transportation was available. (*Id*.)

Moore alleges that on an unspecified date, non-Defendant psychologist Ms. Redding fabricated a claim that Moore intended to harm himself and had him assigned to a mental ward. (*Id*.) Additionally, he claims that she told inmates that he had been charged with rape.[2] (*Id*.) An unidentified physical therapist allegedly told inmates that Moore was a serial killer and a rapist. (*Id*. at 28-29.) On August 4, 2025, Moore was involved in an altercation with other inmates, who allegedly attacked him because they had learned of the nature of the criminal charges against him. (*Id*. at 29.) Moore states that, as a result, he no longer feels safe at PICC. (*Id*.) He also alleges that prison personnel have cursed at him repeatedly, papers he needed to pursue legal claims were withheld from him, and during his religious month his personal property and hygiene articles were withheld from him. (*Id*.) Nurses also allegedly would not help him shower. (*Id*.) He could not participate in religious practices because he could not cleanse himself properly and because his religious materials were withheld from him. (*Id*. at 30.) He filed a grievance addressing these issues and was told to file a lawsuit if he objected to the treatment described.[3] (*Id*.)

---

[2] The publicly available docket in *Commonwealth v. Moore*, CP-51-CR-3509-2024 (C.P. Phila.) reflects that Moore has been charged with, *inter alia*, rape by forcible compulsion; trafficking in individuals; unlawful contact with minor – sexual offense; unlawful restraint/serious bodily injury; interference with custody of children; sexual assault; corruption of minors; concealment of whereabouts of child; indecent assault forcible compulsion; criminal use of communication facility; recklessly endangering another person; tampering with or fabricating evidence; and indecent assault person less than 13 years of age. (*Id*.)

[3] Moore filed more than 100 pages of Exhibits in support of his claims. (*See* ECF No. 2.) These include, *inter alia*, an Inmate Misconduct form, medical records that appear to correspond to the hospital visits described in the Complaint, handwritten letters addressed to "To Whom it May Concern" describing some of the events detailed in the Complaint, several completed but largely illegible grievance forms, and numerous Sick Call Requests. (*See id*.)

Based on the allegations in the Complaint, Moore asserts claims for violations of his First, Fourth, Eighth, and Fourteenth Amendment rights. (*Id*. at 3.) As relief, he seeks a declaratory judgment,[4] injunctive relief,[5] transfer to a different correctional facility,[6] and money damages. (*Id*. at 33-34.)

---

[4] Moore requests a declaration that the Defendants' conduct violated his constitutional rights. (Compl. at 33.) Declaratory relief is unavailable to adjudicate past conduct, so Moore's request for this relief is improper. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). A declaratory judgment is also not "meant simply to proclaim that one party is liable to another." *Corliss*, 200 F. App'x at 84; *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm.").

[5] Moore requests both preliminary and permanent injunctive relief in the form of an order directing Patterson and Heard to provide him with emergency medical attention. (Compl. at 33.) In light of the Court's disposition of his claims, Moore's request for injunctive relief will be denied without prejudice at this time.

[6] The Court cannot grant this relief because it is well-settled that prisoners have no inherent constitutional right to placement in any particular prison, to any particular security classification, or to any particular housing assignment. *See Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005) (holding that the Constitution does not give rise to liberty interest in avoiding transfers to more adverse conditions of confinement); *Lane v. Tavares*, No. 14-991, 2016 WL 7165750, at *16 (M.D. Pa. July 12, 2016) (same).

### B.    Moore's Supplement

In his second Motion for Leave to Proceed *In Forma Pauperis*, Moore included a letter addressed to the undersigned describing his difficulty obtaining a certified copy of his inmate account statement, and referring generally to attacks to which he had been subjected by inmates and staff.  (ECF No. 7 at 4-5.)  The Motion also includes what appears to be a letter, addressed to "To Whom it May Concern," that describes events that Moore alleges occurred on September 12, 2025.  (*Id*. at 8-10.)  The Court liberally construes the second letter as a proposed supplement to the Complaint.

In his proposed supplement ("Supp."), Moore alleges that on September 12, 2025, he was using the telephone when a CO walked past him and dropped a piece of paper.  (*Id*. at 8.)  Moore read the paper – a receipt from a recent x-ray confirming that his hand and wrist were broken as a result of an altercation he was involved in at PICC.  (*Id*.)  Moore approached the CO's desk and asked whether he would undergo any procedures related to the injury and was told that he had refused medical care and would not be permitted to go to the medical unit.  (*Id*. at 8-9.)  Moore asked to speak to a supervisor, but Lt. Lane, who was present, refused to speak with Moore, stating he was busy.  (*Id*. at 9.)  When Moore asked CO Miro for permission to go to the medical unit, she refused his request, stating that no inmates were allowed to visit the medical unit at that time.  (*Id*.)  She then allegedly immediately called another inmate over to the CO's desk and gave him a slip to go to the medical unit.  (*Id*.)  Moore again requested permission to go to the medical unit for his injured arm, adding that he also needed his seizure medication because he had experienced a seizure the prior day.  (*Id*.)  Miro then pushed Moore as she came from behind the desk, while an unidentified supervisor passing the desk remarked that "we not talking to this muther fuxxer.  Pepper spray this muther fuxxer!"  (*Id*.)  Miro, smiling, pepper sprayed

Moore in the eyes. (*Id*.) When Moore ran to the showers to rinse his eyes, Miro followed him, pulled him out of the shower, and slammed the shower door on his head. (*Id*. at 9-10.) Miro then dragged Moore down a flight of metal stairs by his shirt collar, strangling him until he passed out. (*Id*. at 10.) Additionally, while he was being dragged, Moore hit his legs and knees on each stair, causing injury. (*Id*.) He also suffered a large lump on his head. (*Id*.) When he awoke in the medical unit, he was told that he had experienced a seizure. (*Id*.) Moore maintains that he did not show any sign of aggression that would warrant Miro's conduct. (*Id*.)

Federal Rule of Civil Procedure 15(d) provides that, upon motion and reasonable notice, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." F. R. Ci. P. 15(d). "'A supplemental complaint refers to events that occurred after the original pleading was filed. Factors to be considered by the Court in making [a determination under Rule 15(d)] are the same as those to be considered in motions to amend, including the promotion of a justiciable disposition of the case, the delay or inconvenience in permitting a plaintiff to supplement the complaint, any resulting prejudice to the other parties in the action, and whether the supplement would be futile.'" *El v. Matson*, No. 21 -01325, 2022 WL 22905735, at *1 (W.D. Pa. June 3, 2022) (quoting *Millhouse v. United States*, No. 19-665, 2019 WL 5722030, *2 (M.D. Pa. Nov. 5, 2019) (internal citations and quotations omitted; bracketed text in original)). Whether to grant a Rule 15(d) motion to supplement a pleading is within the discretion of the district court. *See, e.g.*, *T Mobile Ne. LLC v. City of Wilmington, Del.*, 913 F.3d 311, 326-27 (3d Cir. 2019). Moore's proposed Supplement refers to events that occurred after he filed his original Complaint. Further, because this case is in its early stages, and the request to supplement preceded the Court's statutory screening of the Complaint,

9

allowing supplementation at this stage will not cause any delay, and considering the events described in the proposed supplement will promote efficient disposition of Moore's claims. Accordingly, the Court will address the claims asserted in the proposed Supplement in the course of its statutory screening of Moore's claims.

## II.   STANDARD OF REVIEW

The Court will grant Moore leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[7]  Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim.  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim.  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024) (3d Cir. 2024).  Conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678.  As Moore is proceeding *pro se*, the Court construes his allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir.

---

[7] Because Moore is a prisoner, the Prison Litigation Reform Act requires that he pay the full filing fee in installments regardless of the outcome of this case.

2013)). *See also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) ("While a court must liberally construe the allegations and 'apply the applicable law, irrespective of whether the pro se litigant mentioned it by name,' *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002), this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support."). An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants." *Vogt*, 8 F.4th at 185.

## III.    DISCUSSION

Moore asserts claims based on alleged violations of his constitutional rights. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).

### A.    Claims Against the PDP

Moore includes the PDP as a Defendant in his Complaint. (Compl. at 2.) However, the PDP is an agency of the City of Philadelphia, and City agencies are not suable entities under § 1983 because they do not have a separate legal existence. *See Vurimindi v. City of Philadelphia*, No. 10-88, 2010 WL 3169610, at *1 (E.D. Pa. Aug. 10, 2010) (under 53 Pa. Cons. Stat. § 16257, "no such department shall be taken to have had . . . a separate corporate existence, and hereafter all suits growing out of their transactions . . . shall be in the name of the City of Philadelphia");

11

*White v. City of Philadelphia*, No. 21- 2688, 2021 WL 4169424, at *3 (E.D. Pa. Sept. 14, 2021) (citing *Vurimindi* and dismissing claims against PDP because it is not separate legal entity from City); *Green v. City of Philadelphia*, No. 19-2190, 2019 WL 2766590, at *3 (E.D. Pa. June 28, 2019) (same).  Accordingly, Moore's claims against the PDP are not plausible and will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

### B.    Official Capacity Claims

Moore asserts official capacity claims against all the Defendants.  (Compl. at 14.)  For the following reasons, these claims are not plausible and will be dismissed.

Claims against City officials such as Defendants Patterson, Rose, Denmark, and Miro named in their official capacities are indistinguishable from claims against Philadelphia.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978).  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

To state a claim for municipal liability, a plaintiff must allege that the municipality's policies or customs caused the alleged constitutional violation.  *See Monell*, 436 U.S. at 694; *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).  The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard.  *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).  It is not enough, however, to allege the existence of a policy or custom.  "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries."  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  This can be done "by demonstrating an 'affirmative link' between the policy or custom

12

and the particular constitutional violation" alleged.  *Id.*  Allegations that simply paraphrase the standard for municipal liability are too vague and generalized to support a claim against the City. *See, e.g.*, *Szerensci v. Shimshock*, No. 20-1296, 2021 WL 4480172, at *7 (W.D. Pa. Sept. 30, 2021) ("Plaintiffs' conclusory allegation, which generally paraphrases the relevant standard, is insufficient to state a claim for § 1983 liability under *Monell*.") (citing cases).  "It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."  *See Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

Moore does not attempt to allege that the constitutional violations of which he complains were the result of a custom or policy of the City of Philadelphia.  As such, he has not stated a plausible official capacity/*Monell* claim.  His official capacity claims against Patterson, Rose, Denmark, and Miro will be dismissed, and he will be granted leave to amend his claims to include a municipal liability claim against the City of Philadelphia.

### C.    Claims Against Corizon

Moore includes Corizon as a Defendant in his Complaint, and he describes it as "the medical staffing unit assigned to assist inmates."  (Compl. at 3, 14.)  A private corporation under contract to provide medical services at a jail or prison may be liable under § 1983 in certain circumstances.  The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'"  *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale*, 318 F.3d at 583 (applying *Monell* to claims against medical contractor)).  Rather, in order to hold a private health care company like Corizon liable for a constitutional violation under § 1983, Moore must allege the provider had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he]

13

allege[s]." *Natale*, 318 F.3d 575, 583-84 (citing *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs.") (citations and quotations omitted).  Generalized allegations of insufficient staffing fail to state a claim where, as in this case, the Complaint does not allege a constitutional violation attributable to Corizon's policies or customs.  *See Brown v. Delaware Cnty. Prison Bd. of Inspectors*, 741 F. App'x 135, 138 (3d Cir. 2018) (*per curiam*) ("Brown's vague and conclusory allegation that the defendants had a policy or custom of 'fail[ing] to provide an adequate level of security staffing,' is insufficient to state a claim.").

A plaintiff may also state a basis for liability against an entity like Corizon by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).  In the context of a contract medical provider, the provider's "failure to train or supervise must amount to a policy or custom in disregard of an obvious risk that its employees or agents would commit constitutional violations." *Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 526 (M.D. Pa. 2017), *aff'd in part, vacated in part on other grounds sub nom. Ponzini v. Monroe County*, 789 F. App'x 313 (3d Cir. 2019).

Moore's Complaint does not include any factual allegations as to Corizon, and therefore, any claim against Corizon is not plausible.  This claim will be dismissed without prejudice and Moore will be granted leave to amend if he is able to allege additional facts about a Corizoon policy or custom that violated his rights.

Moore also asserts official capacity claims against Heard and Corizon.  (*See* Compl.)  To the extent that Moore asserts claims against Heard in his "official capacity," the claim is not cognizable because Corizon is a private entity.  *See Kreis v. Northampton Cnty. Prison*, No. 21-2360, 2022 WL 4236692, at *8 (E.D. Pa. Sept. 14, 2022) (stating that official capacity claims are "inapplicable to suits against private parties where the entity is also susceptible to suit") citing *Owens v. Connections Cmty. Support Programs, Inc.,* 840 F.Supp.2d 791, 796 (D. Del. 2012) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to compel that officer to take some official action [and that] concept . . . is inapplicable to suits against private parties where the entity is also susceptible to suit.").  Even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works.  *See Graham,* 473 U.S. at 105.  Moore has included Corizon as a Defendant, and his official capacity claim against Heard will, accordingly, be dismissed with prejudice.

### D.    Claims Based on Participation in Grievance Process

Moore claims that Rose and Patterson disregarded his grievances and interfered with his right to seek redress through the grievance system.  (Compl. at 31.)  He further claims that they did so "in retaliation" and violated his First Amendment rights.[8]  (*Id*.)  For the following reasons, these claims are not plausible.

---

[8] To the extent Moore seeks to assert a retaliation claim, it is conclusory and undeveloped.  Other than asserting that Patterson and Rose disregarded his grievances for a retaliatory purpose, he alleges no facts in support of this claim.  A "'passing reference' to jurisprudential precepts without more does not bring that issue before the Court in that it provides no basis for a ruling one way or the other."  *Campbell v. LVNV Finding, LLC and Resurgent Capital Servs.*, No. 21-5388, 2022 WL 6172286, at *7 (E.D. Pa. Oct. 7, 2022) (citing *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)); *Alexis v. Sessions*, No. 18-2099, 2018 WL 5077899, at *2 n.1 (D.N.J. Oct. 18, 2018).  Any retaliation claim that

15

Claims based on the handling of prison grievances fail because "prisoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)). Accordingly, claims such as those asserted by Moore predicated on failures of the grievance process or improper handling of or response to grievances do not give rise to a constitutional claim. *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotations and citations omitted)). Accordingly, Moore's claims against Patterson and Rose based on their handling of grievances will be dismissed with prejudice. *See Caterbone v. Lancaster Cnty. Prison*, No. 19-2052, 2019 WL 2774162, at *3 (E.D. Pa. July 2, 2019), *aff'd*, 811 F. App'x 721 (3d Cir. 2020) (dismissing claim regarding prison grievance system with prejudice at the screening stage); *Easton v. Penchishen*, No. 21-5464, 2022 WL 407640, at *2 (E.D. Pa. Feb. 10, 2022) (same).

---

Moore seeks to assert will be dismissed without prejudice, and Moore will be granted leave to amend.

### E.    Claims Against Patterson Based on Cell Search and Confiscation of Property

Moore alleges that he was evacuated from his cell when smoke filled his block, and when he returned, it appeared as though his cell had been searched, and personal items were missing. (Compl. at 25.)  He asserts Fourth and Fourteenth Amendment claims against Patterson.[9]  (*Id*. at 32.)  For the following reasons, these claims are not plausible.

First, although Moore asserts claims based on the search of his cell and confiscation of his property against Patterson, he does not allege that Patterson was personally involved in the cell search or confiscated or otherwise removed his personal property.  In the absence of any allegation that Patterson was personally involved in the alleged constitutional violation, Moore cannot state a plausible claim against him.  *Rode*, 845 F.2d at 1207.

Next, even if Moore had alleged that Patterson participated in the cell search of which he complains, no liability would attach.  "[P]risoners have no legitimate expectation of privacy and . . . the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984); *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The Supreme Court has concluded that the Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration."); *Taylor v. Knapp*, 871 F.2d 803, 806 (9th Cir. 1989) (explaining that the Fourth Amendment "does not protect an

---

[9] Moore also refers to the Fifth Amendment.  (Compl. at 32.)  The Fifth Amendment, however, applies only to the federal government and federal officials. *Shoemaker v. City of Lock Haven*, 906 F. Supp. 230, 237 (M.D. Pa. 1995).  "It does not apply to the acts or conduct of the states, their agencies, subdivisions, or employees." *Id.*  Because the defendants here are not federal actors, the Fifth Amendment is not applicable in this case and Moore's Fifth Amendment claim will be dismissed with prejudice. *Patrick v. Rodriguez*, No. 23-00672, 2023 WL 10410947, at *15 (M.D. Pa. Nov. 20, 2023), *report and recommendation adopted*, 2024 WL 1159242 (M.D. Pa. Mar. 18, 2024), *reconsideration denied*, 2024 WL 4868305 (M.D. Pa. Apr. 15, 2024).  To the extent Moore asserts a due process claim based on the confiscation of his personal property, the Court will construe that claim as asserted under the Fourteenth Amendment.

17

inmate from the seizure and destruction of his property"). *See also Wassel v. Pike County*, No. 22-0145, 2025 WL 1710540, at *6  (M.D. Pa., March 14, 2025), *report and recommendation adopted*, 2025 WL 1710245 (M.D. Pa. June 18, 2025) (granting motion to dismiss claims arising from cell search and confiscation of legal papers asserted against warden because "the search of a pretrial detainee's cell by prison officials does not violate the Fourth Amendment or offend principles of due process, nor do pretrial detainees have a constitutional right to be present during the searches of their cells.") (citing *Block v. Rutherford*, 468 U.S. 576 (1984)). Accordingly, Moore's claim based on the alleged search of his cell is not plausible and will be dismissed with prejudice.

Additionally, to the extent Moore raises a constitutional claim based on the alleged confiscation of his personal property, the claim is not plausible.  Unauthorized intentional deprivations of property "[do] not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.  A correctional facility's grievance procedure provides an adequate postdeprivation remedy for intentional deprivations of property by correctional employees. *Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 422 (3d Cir. 2000) (holding that prison grievance system provides adequate post-deprivation remedy). Accordingly, Moore's claim against Patterson is not plausible because he had an adequate remedy for the deprivation of his property through the prison grievance system. *See, e.g.*, *Mbewe v. Delbalso*, No. 23-2054, 2024 WL 510500, at *3 (3d Cir. Feb. 9, 2024) (*per curiam*) (affirming dismissal of due process claim since: "[t]he prison grievance procedure provides an adequate post-deprivation remedy, and the existence of this post-deprivation remedy forecloses [plaintiff's] due process deprivation of property claim" (citation omitted)); *Ransome v.*

*Longstreth*, No. 23-1726, 2023 WL 6122139, at *2 (3d Cir. Sept. 19, 2023) (*per curiam*)

(existence of prison grievance process precluded due process claim, even where prisoner alleged

violations of the grievance policy).  "Even if the prison grievance procedures could be

considered constitutionally inadequate, Pennsylvania's state tort law would provide an adequate

remedy."  *Hernandez v. Corr. Emergency Response Team*, 771 F. App'x 143, 145 (3d Cir. 2019)

(*per curiam*) (citing 42 Pa. Cons. Stat. Ann. § 8522(b)(3)); *see also Lawson v. Ferguson*, No. 22-

2365, 2023 WL 2770820, at *3 n.3 (3d Cir. Apr. 4, 2023) (*per curiam*) ("Even if the prison's

grievance procedures were inadequate to address Lawson's claims, state tort law could serve as

an adequate post-deprivation remedy.").

While the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Con. Stat. § 8541,

provides "no local agency shall be liable for any damages on account of any injury to a person or

property caused by any act of the local agency or an employee thereof or any other person," there

are exceptions to this grant of immunity.  *See id*. § 8542(b).  One such exception is that a

political subdivision like Philadelphia may be held

> liable for damages on account of an injury to a person or property within the
> limits set forth in this subchapter if both of the following conditions are satisfied
> and the injury occurs as a result of one of the acts set forth in subsection (b):
> (1) The damages would be recoverable under common law or a statute
> creating a cause of action if the injury were caused by a person not having
> available a defense under section 8541 (relating to governmental
> immunity generally) or section 8546 (relating to defense of official
> immunity); and
> (2) The injury was caused by the negligent acts of the local agency or an
> employee thereof acting within the scope of his office or duties with
> respect to one of the categories listed in subsection (b).  As used in this
> paragraph, "negligent acts" shall not include acts or conduct which
> constitutes a crime, actual fraud, actual malice or willful misconduct.

Because, under these provisions, Moore has a meaningful post-deprivation remedy available for

his property loss claim in an appropriate state court, his constitutional claim based on alleged

19

confiscation of his personal property is not plausible and must be dismissed with prejudice.  *See*

*Wassel*, 2025 WL 1710540, at \*7 (granting motion to dismiss claim based on confiscation of

legal paperwork because "it is well settled that when an inmate has some post-deprivation

avenue of relief, '[a] prisoner in Pennsylvania cannot state a constitutional claim based on the

loss of his property.'") (citations omitted).

F.      **Claims Based on Conditions of Confinement**

Moore alleges that he was placed in cells at both PICC and PDC that lacked running

water and were contaminated with human waste.  (Compl. at 15-16.)  He also alleges that while

he was housed at PICC, a sewage pipe burst flooding his cell with water and sewage, destroying

his personal property and making prayer difficult.  (*Id*. at 18-19.)  Additionally, he alleges that

while at PICC, the HVAC system failed, leaving him in a cell in which the temperature exceeded

100 degrees, a condition that ultimately caused him to faint and require medical attention.  (*Id*. at

19-22.)  The Court liberally construes the Complaint as seeking to assert a Fourteenth

Amendment claim based on the conditions of Moore's confinement.

The Due Process Clause of the Fourteenth Amendment governs claims brought by

pretrial detainees.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To establish a basis for

a Fourteenth Amendment violation, a prisoner must allege that his conditions of confinement

amount to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  *Hope v. Warden York Cnty.*

*Prison*, 972 F.3d 310, 325 (3d Cir. 2020) (noting that "detainees may not be punished before

they are adjudicated guilty").  "Unconstitutional punishment typically includes both objective

and subjective components."  *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  "[T]he

objective component requires an inquiry into whether the deprivation was sufficiently serious

and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted).

In that regard, "a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'" *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (abrogation on other grounds recognized by *Fisher*, 115 F.4th 197) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017).  Courts should consider the totality of the circumstances in evaluating such a claim.  *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution.").  Furthermore, "[i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," courts are obligated to keep in mind that "such considerations are peculiarly within the province and professional expertise of corrections officials . . . ."  *Stevenson*, 495 F.3d at 68 n.3.

Moore's conditions of confinement claims are not plausible as pled because he does not identify who made the decision to place him in contaminated cells without running water or why. He does not identify which, if any, of the named Defendants were responsible for the burst sewage pipe or failure of the HVAC system, or which, if any of them, failed to ameliorate the conditions caused by those events.  Because Moore does not attribute any of the conditions described in the Complaint to any of the Defendants, the Complaint fails to provide fair notice of

the grounds upon which his claims against the Defendants rest, as required by Rule 8.[10]  *See*

*Afzal v. N.J. Bd. of Med. Examiners*, No. 22-1609, 2022 WL 4533826, at *3 (3d Cir. Sept. 28,

2022) (*per curiam*) (affirming dismissal of complaint pursuant to Rule 8 because plaintiff failed

to plead adequate factual content to support a reasonable inference that defendants were liable

and failed to present cognizable legal claims to which defendants could respond on the merits).

Accordingly, Moore's conditions of confinement claims will be dismissed without prejudice, and

he will be granted leave to file an amended complaint to "flesh out his allegations by . . .

explaining in the amended complaint the 'who, what, where, when and why' of his claim."  *See*

*Davis v. Internal Revenue Serv.*, No. 21-4728, 2022 WL 407639, at *3 (E.D. Pa. Feb. 9, 2022);

(citing *Gambrell v. S. Brunswick Bd. of Educ.*, No. 18-16359, 2019 WL 5212964, at *4 (D.N.J.

Oct. 16, 2019)).

**G.**      **Claims Against Warden Rose Based on Interference with Religious Freedom**

In his Complaint, Moore alleges that personal hygiene items and personal property were

withheld from him, and that unidentified nurses would not help him shower.  (Compl. at 29, 30.)

He claims that, as a result, he could not cleanse himself sufficiently, and lacked religious items,

including rugs, books, and adornments, and so could not practice his religion.  (*Id*.)   Moore

alleges that he filed a grievance objecting to this treatment and that in response he was told to file

a lawsuit if he did not agree with the treatment.  (*Id*. at 30.)  He asserts a First Amendment claim

against Warden Rose for interfering in his right to freely practice his religion.  (*Id*. at 32.)  This

claim is not plausible and will be dismissed.  Moore will be granted leave to amend it.

---

[10] The Court notes that Moore asserts an Eighth Amendment claim against Patterson for causing him "continuous pain, suffering, injury, and emotional distress," (Compl. at 31), but it is not clear that this claim arises from the conditions of confinement that Moore experienced.  Moore will be granted the opportunity to clarify this claim upon amendment.

The United States Supreme Court has recognized that the First Amendment guarantees that all prisoners must be afforded reasonable opportunities to exercise their religious freedom. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972); *see also O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion.") (citations omitted). However, in order to state a plausible Free Exercise claim, a plaintiff must allege a "substantial burden" on the exercise. *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972). Moreover, although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348 (quotations omitted). While the federal courts must take cognizance of valid constitutional claims of prison inmates, the Supreme Court repeatedly has cautioned that the task of prison administration has been committed to the responsibility of the legislative and executive branches of government; federal courts should be reluctant to second guess these authorities. *See, e.g., Turner v. Safley*, 482 U.S. 78, 84 (1987); *O'Lone*, 482 U.S. at 353.

The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden. *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) (internal citations omitted). For example, the Supreme Court has stated that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz*, 405 U.S. at 322 n. 2. "The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has

23

an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice." *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970).

Moore's claim against Rose based on alleged interference with the practice of his religion fails for a number of reasons. First, he does not attribute any of the conduct that he claims caused the interference to any action taken by Rose. He does not allege that Rose would not assist him in bathing, or that Rose instructed the nurses to refuse to assist him. He does not allege that Moore confiscated his religious materials or refused to return them. (*See* Compl.) As such, Moore has not plausibly stated a claim against Rose. *See Rode*, 845 F.2d at 1207 ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.) Further, Moore does not identify who interfered with his ability to practice his religion and, significantly, does not attribute the conduct to any of the named Defendants, and, therefore, has not plausibly stated a claim against any of them based on interference with his right to practice his religion. Upon amendment, Moore may identify any individual he alleges created substantial burden to his exercise of his First Amendment rights.

## H.    Claims Against Heard Based on Deliberate Indifference Claims

In his Complaint, Moore alleges he required medical care following several seizure events, and after he broke his forearm and wrist in a fall. He also alleges that he required surgery to remove a bullet lodged in his chest, which he had scheduled before his arrest and detention. (*See* Compl.) He asserts deliberate indifference claims against Defendant Heard, who allegedly disregarded numerous sick calls and lied to unidentified "inmate help facilities" when he told them that Moore had received medical services that Moore, in fact, had not received. (Compl. at 32-33.) For the following reasons, Moore's deliberate indifference claims are not plausible as pled.

24

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). As it appears that Moore was a pretrial detainee at the time of the events in question, the Fourteenth Amendment governs his claims. *See Hubbard*, 399 F.3d at 166. The standard under the Eighth Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017) (*per curiam*).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991).

Not every complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*). "Where a prisoner is receiving some amount of medical treatment, [courts]

presume that the treatment is adequate absent evidence that it violates professional standards of care." *Id*. (affirming dismissal of deliberate indifference claims on screening) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see also Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020) (*per curiam*) ("Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."); *Davis v. Superintendent Somerset SCI*, 597 F. App'x 42, 45 (3d Cir. 2015) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'") (*per curiam*) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

Moore's Complaint refers to medical needs including seizures, a broken forearm and wrist, and a bullet lodged in his chest with allegedly related abnormal EKG results. According to the Complaint, Moore was treated each time he had a seizure, and, therefore, this is not a basis for a deliberate indifference claim based on a denial of treatment. Notably, Moore also alleges that in November 2024, he was examined at Jefferson University Hospital where his arm was x-rayed, showing fractures to his forearm and wrist. (Compl. at 24.) The attending physician recommended that corrective surgery be performed within a week. (*Id*.) The surgery did not take place until March 2025. (*Id*. at 25.) There are no allegations in the Complaint explaining the long delay in treatment. Moore also alleges that, though he informed prison personnel numerous times that he required surgery to remove a bullet lodged in his chest, and had received abnormal EKG results requiring treatment by a cardiologist, he was never taken to the cardiologist because transportation was not available. (*Id*. at 28.)

26

While Moore asserts deliberate indifference claims against Heard based on a delay in receiving care, he does not allege that Heard was involved in his care, made decisions regarding his care, or was aware that he required treatment and delayed that care.[11]  Because he is not alleged to have participated in any way in the alleged constitutional violations, this claim against Heard is not plausible.  Moreover, as with his conditions of confinement claims, Moore does not identify any other individuals involved in the violation of his constitutional rights.  Leave to amend will be granted to permit Moore to identify any individuals who were involved in the decisions that resulted in the constitutional violations alleged.

## I.        Claims Against Denmark and Miro Based on Use of Excessive Force

Moore asserts several claims based upon Denmark's and Miro's alleged use of excessive force.  (*See* Compl. and Supp.)  Excessive force claims brought by convicted prisoners are analyzed under the Eighth Amendment's Cruel and Unusual Punishment Clause, while claims brought by pretrial detainees are analyzed under the Fourteenth Amendment's Due Process Clause.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015); *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193-94 (3d Cir. 2021).  The distinction is significant because the "language of the two Clauses differs, and the nature of the claims often differs." *Kingsley*, 576 U.S. at 400. When a convicted prisoner brings an Eighth Amendment excessive force claim against a prison official, the court must consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 468 U.S. at 526-27. The malicious-and-sadistic standard for an Eighth Amendment claim is subjective, but an objective standard is applied to a Fourteenth Amendment claim.  *See Kingsley*, 576 U.S. at 400

---

[11] Moore presumably asserts his claims against Heard because he is identified as the head of medical administration at Corizon.  However, Moore has not plausibly alleged a claim against Heard based on his role as a supervisor. *See infra* at Section III.J.

27

(explaining that the reason for the lesser standard in a Fourteenth Amendment claim is that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'"); *Jacobs*, 8 F.4th at 194 ("In 2015, the Supreme Court clarified that the subjective Eighth Amendment standard does not apply to pretrial detainees.").

To state a due process violation based on excessive force, a pretrial detainee must allege plausibly that "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. Whether unreasonable force has been used against a detainee "requires 'careful attention to the facts and circumstances of each particular case.'" *Jacobs*, 8 F.4th at 194 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts should analyze "these circumstances 'from the perspective of a reasonable officer on the scene'" while keeping in mind that decisions about force require the expertise of correctional officers, "'who must have substantial discretion to devise reasonable solutions to the problems they face.'" *Id.* at 195 (quoting *Kingsley*, 576 U.S. at 397 & 399).

### 1.    Denmark

Moore alleges that during medication distribution, CO Denmark slapped and punched him and told him to take his "F'n meds" when Moore informed him that the medication with which he was provided was different than what he usually took. (Compl. at 16.) He claims that he was not violating any prison rules at the time and was not acting disruptively. (*Id*. at 30.) He

further claims that because of Denmark's actions, he suffered physical injury, including a split lip and emotional distress. (*Id*.) In short, Moore alleges that he suffered injury following an unprovoked physical attack by Denmark. At this early stage of the litigation, Moore has stated a plausible excessive force claim against Denmark and this claim will be served for a responsive pleading.

### 2. Miro

Moore alleges that at the behest of a supervisor and without provocation, Miro sprayed him in the eyes with pepper spray, smiling as she did so, then prevented him from rinsing his eyes and slammed a shower door on his head, injuring him. (Supp. at 9-10.) She then dragged Moore down a flight of metal stairs by his shirt collar, strangling him until he passed out and injuring his legs, knees, and head in the process. (*Id*. at 10.) He alleges that this conduct followed his request to go to the medical unit for treatment for a broken arm and for his seizure medication. (*Id*. at 9.) Additionally, he maintains that he did not show any sign of aggression that would warrant Miro's conduct. (*Id*. at 10.) In short, he claims that Miro needlessly sprayed him in the face with pepper spray when he asked for permission to go to the medical unit, then dragged and strangled him, causing injury. At this early stage of the litigation, Moore has stated a plausible excessive force claim against Miro and this claim will be served for a responsive pleading. *See Drummond v. Angelucci*, No. 23-4767, 2024 WL 2136284, at *8 (E.D. Pa. May 10, 2024) (permitting excessive force claim to proceed past screening where pretrial detainee alleged he was "needlessly sprayed [ ] in the face with pepper spray when he requested to speak to a superior officer"); *Moore v. Rosa*, No. 21-0933, 2021 WL 1143376, at *3 (E.D. Pa. Mar. 25, 2021) (permitting excessive force claim to proceed past screening where plaintiff was pepper sprayed "without warning" after asking for supervisor); *Baker v. Crookus*, No. 21-4615, 2021

WL 5711830, at *3 (E.D. Pa. Dec. 1, 2021) (permitting excessive force claim to proceed past screening where plaintiff alleged correctional officer's use of pepper spray was "wholly unprompted and that lesser measures may have been appropriate").

### J.        Supervisory Liability

To the extent Moore bases any claims against Patterson and Rose on their roles as PICC and PDC Wardens, respectively, or against Heard based on his role as director of medical administration at Corizon, these claims are not plausible as pled.  Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  A director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).  Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis.  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015); *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*).

Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *Id.*

30

(quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227.

The first type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must "identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure." *Barkes*, 766 F.3d at 317; *see also Chavarriaga*, 806 F.3d at 227.  A supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official.  *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that claims asserted against supervisor defendants were meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation).

To set forth a claim for supervisory liability under the policy-and-practice strand of supervisory liability, a plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

31

*Chavarriaga*, 806 F.3d at 227 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001)). "Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Id.*

Also, "[u]nder Section 1983, a supervisor may be liable for [his or her] failure to train or supervise employees. . . ." *Whitfield v. City of Philadelphia*, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008). A claim for supervisory liability or liability based upon a failure to train involves four elements: (1) that an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of this unreasonable risk; (3) the supervisor was indifferent to the risk; and (4) the injury resulted from the policy or practice. *See Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Where a need for "more or different training . . . is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train . . . can fairly be said to represent official policy," *City of Canton v. Ohio*, 489 U.S. 378, 390 (1989), and where that failure to train "actually causes injury," a supervisor may be held liable. In addition,

> In resolving the issue of [supervisory] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training. . . . Moreover, for liability to attach . . . the identified deficiency in [the] training program must be closely related to the ultimate injury.

*Id*. at 390-91.

The Complaint does not allege that Patterson, Rose, or Heard established or maintained a policy, practice or custom which directly caused the constitutional violations of which Moore complains under a failure to train theory or otherwise. Moreover, the Complaint does not allege

that these Defendants participated in violating Moore's rights, directed others to violate them, or, as the individuals in charge, had knowledge of and acquiesced in any subordinate's unconstitutional conduct.  Accordingly, Moore has not stated a plausible claim against Patterson, Rose, or Heard based on their roles as supervisors and these claims will be dismissed without prejudice.  Moore will be granted leave to amend these claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Moore leave to proceed *in forma pauperis* and will permit him to supplement his Complaint.  The following claims will be dismissed with prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii): Moore's claims against the PDP, his claims based on handling of grievances, his Fourth Amendment claims based on the search of his cell, his Fourteenth Amendment claims based on confiscation of his personal property, his Fifth Amendment claim, and his official capacity claim against Heard. The following claims will be dismissed without prejudice for failure to state a claim: Moore's claims against Corizon, his First Amendment retaliation and religious freedom claims, his Fourteenth Amendment conditions of confinement and deliberate indifference claims, his claims asserting supervisory liability, and his official capacity claims against Patterson, Rose, Denmark, and Miro.  Moore will be granted leave to amend these claims.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002).  The Court is prepared to serve Moore's excessive

force claims against Denmark and Miro, but Moore will first be given the option of amending his Complaint to address the deficiencies identified in this Memorandum, or of preceding at this time on his claims against Denmark and Miro.

An appropriate Order accompanies this Memorandum.